KIMBALL JONES, ESQ.
Nevada Bar No.: 12982
**BIGHORN LAW**
3675 W. Cheyenne Ave., Suite 100
North Las Vegas, Nevada 89032
Phone: (702) 333-1111
Email: kimball@bighornlaw.com
*Attorneys for Plaintiffs*

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| BABYSTACKS CAFÉ, LLC, a Domestic Limited Liability Company; REBEL KITCHEN INC. dba MANIZZA'S PIZZA, a Foreign Limited Liability Company; TIMELESS CUISINE, LLC dba ESTHER'S KITCHEN, a Domestic Limited Liability Company; GAETANO'S HOSPITALITY GROUP, LLC dba GAETANO'S RISTORANTE, a Domestic Limited Liability Company; MUNCH-A-SUB LLC, a Domestic Limited Liability Company, and on behalf of the Class of similarly situated individuals, <br><br> Plaintiffs, <br><br> vs. <br><br> UBER TECHNOLOGIES, INC., a Foreign Corporation; RASIER, LLC, a Foreign Limited Liability Company; BERCHMANN MELANCON, an individual; NICK "DOE", an individual; KARINA "DOE", an individual; DOE CEO, I through X; DOE SALES REPRESENTATIVE, I through X; DOE MANAGER, I through X; DOE DRIVER, I through X; DOE EMPLOYEE, I through X; DOES I through X; ROE CORPORATIONS, XI through XX; and ROE ENTITIES, XI through XX, inclusive, <br><br> Defendants. | CASE NO.:   2:24-cv-01098-JCM-MDC <br><br> **SECOND AMENDED COMPLAINT** |

COMES NOW Plaintiffs BABYSTACKS CAFÉ, LLC, a Domestic Limited Liability

Company; REBEL KITCHEN INC. dba MANIZZA'S PIZZA, a Foreign Limited Liability

Company; TIMELESS CUISINE, LLC dba ESTHER'S KITCHEN, a Domestic Limited Liability Company; GAETANO'S HOSPITALITY GROUP, LLC dba GAETANO'S RISTORANTE, a Domestic Limited Liability Company; MUNCH-A-SUB LLC, a Domestic Limited Liability Company, and on behalf of the Class of similarly situated individuals, by and through their counsel of record, KIMBALL JONES, ESQ., with the Law Offices of **BIGHORN LAW**, and for their causes of action against the Defendants, and each of them, complains and alleges as follows:

## PARTIES AND JURISDICTION:

1. Upon information and belief, at all times relevant to this action, Plaintiff REBEL KITCHEN INC. dba MANIZZA'S PIZZA (hereinafter referred to as "MANIZZA'S" and/or "PLAINTIFF" and/or collectively as "PLAINTIFFS") is a Foreign Corporation operating a pizza restaurant located at 6090 S. Rainbow Blvd., Suite 2, Las Vegas, Nevada 89118.

2. Upon information and belief, at all times relevant to this action, Plaintiff TIMELESS CUISINE, LLC dba ESTHER'S KITCHEN (hereinafter referred to as "ESTHER'S" and/or "PLAINTIFF" and/or collectively as "PLAINTIFFS") is a Domestic Limited Liability Company operating a restaurant located at 1131 S. Main St., Las Vegas, NV 89104.

3. Upon information and belief, at all times relevant to this action, Plaintiff BABYSTACKS CAFÉ, LLC (hereinafter referred to as "BABYSTACKS" and/or "PLAINTIFF" and/or collectively as "PLAINTIFFS") is a Domestic Limited Liability Company operating seven (7) restaurants located in Las Vegas, NV.

4. Upon information and belief, at all times relevant to this action, Plaintiff GAETANO'S HOSPITALITY GROUP, LLC dba GAETANO'S RISTORANTE (hereinafter referred to as "GAETANO'S" and/or "PLAINTIFF" and/or collectively as "PLAINTIFFS") is a

. . .

Domestic Limited Liability Company operating a restaurant located at 10271 S Eastern Ave #111 Henderson, NV 89052.

5. Upon information and belief, at all times relevant to this action, Plaintiff MUNCH-A-SUB LLC (hereinafter referred to as "MUNCH" and/or "PLAINTIFF" and/or collectively as "PLAINTIFFS") is a Domestic Limited Liability Company operating a restaurant located at 5320 Cameron St., Suite 1, Las Vegas, NV 89118.

6. Upon information and belief, at all times relevant to this action, Defendant UBER TECHNOLOGIES, INC. (hereinafter referred to as "UBER" and/or "Defendants") is a Foreign Corporation operating a food delivery service under the name of UBER EATS in Las Vegas.

7. Upon information and belief, at all times relevant to this action, Defendant RASIER, LLC (hereinafter referred to as "RASIER" and/or "Defendants") is a Foreign Limited Liability Company, which, upon information and belief, is the third-party company used by UBER/UBER EATS to pay its delivery drivers.

8. Upon information and belief, at all times relevant to this action, Defendant BERCHMANN MELANCON (hereinafter referred to as "MELANCON" and/or "DEFENDANT" and/or collectively as "DEFENDANTS"), was a resident of the State of Arizona, and was the "territory lead" for Uber Eats, overseeing the activities of Uber Eats in Nevada.

9. Upon information and belief, at all times relevant to this action, Defendant NICK "DOE" (hereinafter referred to as "NICK" and/or "DEFENDANT" and/or collectively as "DEFENDANTS"), was a resident of the State of Nevada, and was a driver for UBER/Uber Eats. Plaintiffs are ignorant as to the true identity of NICK, including his last name, and therefore sues him under the fictious last name of "DOE" until his real last name can be ascertained.

. . .

10. Upon information and belief, at all times relevant to this action, Defendant KARINA "DOE" (hereinafter referred to as "KARINA" and/or "DEFENDANT" and/or collectively as "DEFENDANTS"), was a resident of the State of Nevada, and was a driver for UBER/Uber Eats  Plaintiffs are ignorant as to the true identity of KARINA, including her last name, and therefore sues her under the fictious last name of "DOE" until her real last name can be ascertained.

11. Plaintiffs are ignorant of the true names and capacities of the defendants sued herein as DOES I through X and ROE COMPANIES I though X and therefore sue these defendants by such fictitious names.  Plaintiffs will seek to amend this complaint to allege such names and capacities as soon as they are ascertained.  Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named defendants is in some manner responsible, liable, and/or obligated to Plaintiff in connection with the acts alleged herein.

12. At all times relevant to this action, DEFENDANT ROE EMPLOYERS I-V were employing DEFENDANTS, and each of them, and each of said DEFENDANTS were acting in the course and scope of said employment at all times relevant to the incident described herein.

13. The true names and capacities, whether individual, corporate, partnership, associate or otherwise, of DEFENDANTS, DOES I through V and ROES I through V, are unknown to PLAINTIFF, who therefore sues said DEFENDANTS by such fictitious names. PLAINTIFF is informed and believe and thereon allege that each of the DEFENDANTS designated herein as DOE and ROE are responsible in some manner for the events and happenings referred to and caused damages proximately to PLAINTIFF as herein alleged, and that PLAINTIFF will ask leave of this Court to amend this Complaint to insert the true names and capacities of DOES I through V and ROES I through V, when the same have been ascertained, and to join such DEFENDANTS in this action.

14. At all times relevant hereto the conduct and activities hereinafter complained of occurred within Clark County, Nevada.

**GENERAL AND CLASS ALLEGATIONS**

15. Plaintiffs bring this action pursuant to Rule 23 of the Nevada Rules of Civil Procedure on their own behalf and on behalf of a class of all persons similarly situated (the "Class").

16. The Class Period is the five-year period immediately preceding the filing of this complaint for the Fourth Cause of Action (Civil Rico and Racketeering), the three-year period immediately preceding the filing of this Complaint for the First Cause of Action (Fraudulent misrepresentation), the three-year period immediately preceding the filing of this Complaint for the Second Cause of Action (Conversion), and the two-year period immediately preceding the filing of this Complaint for the Third and Fifth Causes of Action (Defamation and Negligence), and going forward into the future until entry of judgment in this action.

17. The Class consists of all restaurants in operation in Nevada at any time during the Class Period who were victims of impostors utilizing their brand, likeness, identities, and reputations.

18. The Class is so numerous that it is impracticable to join all the Class members before the Court. The exact number of Class members is unknown, but is believed to be in excess of 100 restaurants, past and present.

19. There are questions of law and fact common to the Class that predominate over any questions solely affecting individual Class members including, but not limited to, whether Defendants allowed, caused, and benefitted from the fraudulent co-opting of restaurant identities and conversion of funds when customers believed that they were ordering from a known restaurant with good will in the community, but in actuality, were not.

20. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like other members of the Class, were restaurants who were victims of a scam created and/or permitted by Defendants, and that benefitted Defendants, as well as other unknown parties.

21. Defendants created a web site at Ubereats.com, as well as an app, that allowed for any individual to claim to be a restaurant in Nevada, without requiring reasonable authentication from the requesting party.

22. This business decision allowed unknown individuals to siphon business for themselves using the goodwill created by the actual business owners.

23. The Uber Defendants received money from unsuspecting consumers purchasing from the impostor restaurants through orders that would not have been made through the web site as the actual restaurants did not use Uber.

24. Upon information and belief, the Uber Defendants set the app up in this manner intentionally to harm small restraint businesses, including Plaintiffs, in an effort to take up more of the local restaurant market share as these local restaurants were pushed out due to the impact of this fraud and conversion.

25. Upon information and belief, the Uber Defendants took a thirty percent (30%) cut of all fraudulently obtained payments made through these unethical and illegal activities.

26. The Driver Defendants received money from the impostor restaurants' actions, despite knowing that they were picking up food orders from restaurants that were not the restaurants actually noted on the web service. The Driver Defendants then delivered the food—known to be from an impostor restaurant different than the one noted on the web site and app—and collected fees for these deliveries.

. . .

. . .

27. The actual owners, like the named Plaintiffs in this class, suffered diminution of their brand due to the food created by the impostor restaurants being sub-part replications of food actually created by the actual members of the Class.

28. Defendants thereafter demanded that the legitimate businesses agree to partner with UberEats in order to even challenge the fraudulent businesses siphoning off the legitimate businesses' income and goodwill—all to the Defendants' enrichment.

29. Defendants' demand that Plaintiffs sign up with UberEats forced the parties to agree to this coercion to partner with UberEats, or to undergo further economic and reputational losses.

30. An additional motive for Defendants' demand that Plaintiffs sign up with UberEats was a scheme by UberEats to coerce Plaintiffs into signing an arbitration agreement that was within the sign-up process. UberEats intended thereby to prohibit Plaintiffs from ever suing Uber or UberEats in a court of law by compelling any action to proceed through a binding arbitration process.

31. Plaintiffs will fairly and adequately protect the interests of the Class, and there are no conflicts with respect to the claims herein between the Plaintiffs and the Class.

32. Plaintiffs have retained competent counsel experienced in class action litigation, and Plaintiffs and their counsel will vigorously pursue the claims of the Class throughout this litigation.

33. Individual members of the Class have little interest in controlling the prosecution of separate actions since the amounts of their claims are too small to warrant the expense of prosecuting litigation of this volume and complexity.

34. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying judgments or adjudications with respect to individual

members of the Class, which would establish incompatible standards of conduct for the Defendants.

35. Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making necessary appropriate preliminary and permanent injunctive relief with respect to the Class as a whole.

36. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

37. Plaintiffs anticipate no difficulty in the management of this litigation. Defendants' records should permit identification of and notice to the Class.

## **FACTUAL ALLEGATIONS**

38. During the Class Period, Plaintiffs and each member of the Class were restaurants operating in Nevada.

39. Plaintiffs operated their own independent restaurants which retained their own individual brands and reputations.

40. Defendants were or are the owners and operators of Uber Eats, and/or their employees and/or agents.

41. Defendants UBER, RASIER, and MELANCON conspired together to engage in the fraudulent, negligent, dishonest and unlawful acts as described throughout this Complaint to maximize long-term financial gains at the expense of Plaintiffs rights and hard work building their brands and business.

42. Defendants NICK DOE and KARINA DOE were employees of Defendants UBER and/or RASIER, acting in the course and scope of their employment while they fraudulently, negligently, dishonestly and unlawfully would pick up food from fraudulent businesses and . . .

deliver them to consumers, providing the false impression that the food had been purchased from a legitimate restaurant, even though Defendants knew this was not the case.

43. Defendants benefitted monetarily when customers would purchase food from restaurants through the Uber Eats app or on Ubereats.com.

44. Defendants had agreements with individual and/or businesses who allowed Uber Eats to facilitate transactions from customers through Defendants' app. Defendants would retain a percentage of the purchase price, as well as added fees for delivery and use of the Uber Eats service.

45. Impostor restaurants masquerading as the legitimate Plaintiffs' businesses appeared on the app.

46. On numerous occasions legitimate restaurants complained to Uber of the fraud and conversion being perpetrated against their legitimate businesses.

47. In response to these complaints Uber would require the legitimate restaurant business to sign up through Uber on the claim that this was necessary to "to prove their identity," while requiring no such proof from the fraudulent persons exploiting the legitimate businesses.

48. Moreover, Uber's need to have the legitimate restaurants sign up through the app to prove their identify was an additional part of the fraudulent scam by Uber. In fact, Uber did not need anyone to sign up through the app for Uber to verify they were legitimate businesses. Rather, Uber's claim to these victim restaurants that Uber needed them to sign up through the app was a calculated ploy to cause the upset victim to sign Uber's contract. Uber did this in an effort to foreclose Uber's victims from being able to sue Uber based on fraudulently obtained signatures in the app, which Uber would try to use to unwittingly strip Uber's victims of their right to a trial by jury based on fraudulently obtained agreements to arbitrate their cases on the basis that signing

. . .

these documents was required for Uber to take steps to stop the fraud that Uber was secretly profiting from.

49. In some instances, Uber would temporarily remove the fraudulent entity from the app, but even then Uber would do nothing to prevent perpetrators from again adding the names of the same legitimate benefits a short time later.

50. Members of the Class discovered that anyone could enter the identity of a restaurant and could claim to deliver food as that restaurant.

51. This fraudulent activity was reported to Uber Eats repeatedly, yet Uber Eats made the conscious decision to require the Plaintiffs to decide whether they would partner with UberEats or continue to suffer reputational and economic losses.

52. Members of the Class determined that one impostor, a store operating at 10890 S Eastern Ave, Las Vegas, NV, had been accepting orders meant for no fewer than fourteen (14) restaurants operating in Clark County, Nevada—but whose actual owners had no knowledge of their identities being co-opted on the Uber Eats web site and app.

53. Uber was also made aware that they were profiting from orders being made allegedly from legitimate restaurants, but with pickup locations set by imposters at warehouses or other locations where no restaurants existed.

54. Upon information and belief, Uber was fully aware of imposters stealing the identities of legitimate restaurant businesses by using the names of numerous established restaurants from the same address or from addresses that were inconsistent with that of the legitimate restaurant businesses.

55. At no time did Plaintiffs and the Class given permission for their identities, brand, and reputation to be used by the impostors.

. . .

56.     At no time had Plaintiffs and the Class given permission for their identities, brand and reputation to be used in transactions by Defendants.

57.     Defendants could have easily determined that the applicants were fraudulent due to use of the same address in the Uber Eats app and web site—but instead forced and attempted to force the Plaintiffs into a business relationship with Uber Eats.

58.     Defendants could have easily determined that the applicants were fraudulent due to the address in the Uber Eats app and web site being different than the documented addresses of the legitimate restaurant businesses, which is publicly available information.

59.     Defendants chose to allow the fraudulent applicants to use fake likenesses on the web site and app because it increased the revenue of Uber Eats, including taking thirty percent (30%) of the proceeds of these fraudulent activities, and additionally forced Plaintiffs to partner with Uber Eats, all under the same partnership agreement with Uber Eats.

60.     Plaintiffs and the Class, meanwhile, suffered damage to their reputation and brand as the impostor's food was far inferior than the food and service with the Plaintiffs and Class provided. Defendants' business decision forced Plaintiffs to choose to either sustain business losses through the forced partnership agreement with Uber Eats, or to continue to suffer losses from the fraudulent businesses impersonating the Plaintiffs.

61.     The damages sought by Plaintiffs and the Class for the claims asserted herein exceed $15,000 each, in an exact amount to be proven at trial.

**FIRST CAUSE OF ACTION**
**(Fraudulent Misrepresentation, Consumer Fraud, Negligent Misrepresentation, Negligence Per Se in Violation of NRS 207.173 and 207.174)**

62.     PLAINTIFFS incorporates by this reference all of the allegations from the paragraphs hereinabove, as though completely set forth herein.

. . .

63. At all times material to this Complaint, the acts and omissions giving rise to this action occurred in Clark County, Nevada.

64. Upon information and belief, UBER, RASIER, MELANCON engaged in a civil conspiracy to benefit from tricking customers into purchasing food items from impostor restaurants in Clark County, Nevada.

65. As outlined above, the Defendants' web site was inundated with impostor restaurants whose business model was to impersonate the Plaintiffs' legitimate restaurant brands.

66. When Defendants were confronted with notification of the impostor restaurants, the legitimate restaurants were falsely told that they must sign up to partner with Uber Eats, or continue to have their businesses impersonated on the web site.

67. Upon information and belief, the Defendants could have simply removed the impostor restaurants from the web site and app. Instead, Defendants, to Plaintiffs' detriment, forced them to either continue to suffer from the impostors, or to agree to partner with Uber Eats and agree to an onerous percentage commission to be paid to Uber Eats.

68. Defendants monetarily benefitted from the lucrative order fees and percentages of the sales, both from the impostors, as well as from the newly acquired partnerships with the Plaintiffs.

69. Simultaneously, Plaintiffs and members of the class were harmed by the customers reliance on Defendants misrepresentations as Plaintiffs paid commissions to Uber Eats as their new partner.

70. DEFENDANTS made representations as noted above, while in the course of their business based on pecuniary interests.

71. DEFENDANTS failed to exercise reasonable care or competence in obtaining or communicating these representations to the Plaintiffs.

72. In fact, DEFENDANTS made false representations, as noted above.

73. These false representations were made to cause Plaintiffs to agree to this partnership with Defendants.

74. The Plaintiffs justifiably relied on the false statements from Uber Eats and believed they could not stop the impostor restaurants unless the Plaintiffs agreed to partner with Uber Eats.

75. DEFENDANTS willfully misled PLAINTIFFS, in violation of NRS 207.173 and 207.174, regarding the nature of and activities conducted on its app and website, and are liable for civil penalties for their intentional and negligent violations of law under the legal doctrine of negligence per se.

76. DEFENDANTS' actions included oppression, fraud and malice, both actual and implied, with a knowledge of the probable consequences of their behavior. As such, DEFENDANTS are subject to exemplary or punitive damages.

77. That as a direct and proximate result of the aforesaid breach of duty on the part of DEFENDANTS, PLANTIFFS have been damaged, and are entitled to punitive damages, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

78. DEFENDANTS, and each of them, violated their duties with a conscious disregard for the rights of PLAINTIFFS, which rises to the level of oppression, fraud, and/or malice, and which subjected PLAINTIFFS to cruel and unjust hardship. PLAINTIFFS are therefore entitled to punitive damages against DEFENDANTS, and each of them, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

**SECOND CAUSE OF ACTION**
**(Civil RICO and Racketeering)**

79. PLAINTIFFS incorporates by this reference all of the allegations from the paragraphs hereinabove, as though completely set forth herein.

80. Defendants have adopted and implemented programs to increase the net income of UBER Eats, their employees, and agents by allowing fraud to transpire on their web site and app and by coercing the subject Plaintiffs.

81. "'Racketeering activity' means engaging in at least two crimes related to racketeering that have the same or similar pattern, intents, results, accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents...". NRS 207.390.

82. To recover under Nevada RICO, "three conditions must be met: (1) the plaintiffs' injury must flow from the defendant's violation of a predicate Nevada RICO act; (2) the injury must be proximately caused by the defendant's violation of the predicate act; and (3) the plaintiff must not have participated in the commission of the predicate act." A*llum v. Valley Bank of Nevada*, 109 Nev. 280, 283, 849 P.2d 297, 298 (1993).

83. Predicate RICO acts, or "crimes related to racketeering" are enumerated in NRS 207.360 and 35 separate crimes related to racketeering are listed. Nevada's racketeering statutes, found at NRS 207.350 through NRS 207.520, are herein referred to as "Nevada RICO".

84. Included in NRS 207.360 are the following crimes related to racketeering: Taking property from another under circumstances not amounting to robbery; Obtaining and using personal identifying information of another person in violation of NRS 205.463; Obtaining possession of money or property valued at $650 or more, or obtaining a signature by means of false pretenses.

85. Defendants took and used the identities, brands, likenesses, and reputations of Plaintiffs and the Class and utilized the Class's property to obtain net profits.

86. Defendants likewise obtained personal identifying information of the companies in violation of NRS 205.463.

87. Moreover, by using false pretenses, Defendants obtained Plaintiffs' property in the value of Plaintiffs' brands, likenesses, and reputations—all of which is valued at more than $650. Moreover, Defendants used this property to obtain monies intended for Plaintiffs, but which were then diverted to Defendants in an amount greater than $650.

88. Defendants' use of policies and procedures that permit and encourage fraudulent impostering of businesses is a violation of NRS 205.377, fraud or deceit in course of an enterprise, as Defendants knowingly and with the intent to defraud, engaged in a course of business and continues to engage in a course of business whereby it employs fraudulent impostering of businesses as a device, scheme and artifice which operates as a fraud or deceit upon Customers in Nevada, but also of the Class by means of omission of a material fact that Defendants knows to be omitted while intending for Customers to rely upon the false pretense that the restaurants listed on the app and web site are the actual members of the Class. Defendants use of these policies resulted in a loss to the Class in this case in an amount which exceeds $1,200.00.

89. Plaintiffs were required to retain an attorney to pursue his rights in this matter and an award of reasonable attorney's fees is therefore appropriate.

90. DEFENDANTS' actions included oppression, fraud and malice, both actual and implied, with a knowledge of the probable consequences of their behavior. As such, DEFENDANTS are subject to exemplary or punitive damages.

91. That as a direct and proximate result of the aforesaid breach on the part of DEFENDANTS, PLANTIFFS and the Class has been damaged, and are entitled to punitive damages, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

92. DEFENDANTS, and each of them, violated their duties with a conscious disregard for the rights of PLAINTIFFS and the Class, which rises to the level of oppression, fraud, and/or malice, and which subjected PLAINTIFF to cruel and unjust hardship. PLAINTIFF is therefore

entitled to punitive damages against DEFENDANTS, and each of them, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

## THIRD CAUSE OF ACTION
**(Strict Product Liability – Against Corporate Defendants Only)**

93.     PLAINTIFFS incorporates by this reference all of the allegations from the paragraphs hereinabove, as though completely set forth herein.

94.     Defendants were negligent in the designing, researching, promoting, distributing, testing, advertising, warning, marketing and selling the Uber Eats App:

   a.  Failure to create a reasonably safe app.

   b.  Failure to conduct testing to understand the risks and benefits of the app for both customers and businesses.

   c.  Failure to market in a truthful manner regarding the known risks and benefits of the app, both to the public, and to its Restaurant partners..

   d.  Failure to reasonably inform the public (including Plaintiffs) of the risks posed by the app in general, but also specifically regarding:

      i.   The manner in which the app would facilitate fraud to destroy the reputation of legitimate businesses.

      ii.  The manner in which the app would facilitate fraud to cause businesses to receive bad reviews through no wrongdoing of their own, resulting in a worsening reputation and business loss.

      iii. The manner in which the app would trick customers into believing they were purchasing food from a known restaurant, when in reality they were purchasing food from one of Uber's fraudulent ghost kitchens.

        iv.      The manner in which the app would create unknown health and sanitation risks, which would likely be blamed on legitimate businesses, as Uber's fraudulent ghost kitchens may or may not have proper training in food safety—or may not follow mandatory food safety protocols—as is required for any law-abiding restaurant in the State of Nevada.

    e.    Intentional failure to inform the public regarding the dangers of the app, including falsely informing the public that the app is a safe and reliable way to purchase food from your favorite local restaurants.

    f.    Intentional failure to tell the truth regarding the fraud on the app.

95. Plaintiffs in the class of persons that Defendants should reasonably have foreseen as being subject to the harm caused by the defects in designing, marketing, supplying, promoting, selling and/or distributing the subject app.

96. Defendants are engaged in the business of designing, distributing and selling the subject app, placed said app into the stream of commerce, in a defective and unreasonably dangerous condition, even though the foreseeable risks exceeded the benefits associated with the design of the app. And although Defendants were not required to edit content or postings on the app—the design of the app which allowed for creation of fraudulent restaurants was deficient upon creation.

97. Moreover, the dangerous design defects were not just foreseeable to Defendants, but were known dangers that Defendants intentionally created and/or permitted to maximize Defendants' own revenue.

98. The app was defective due to inadequate warning and/or inadequate testing and/or inadequate reporting regarding the results of such studies.

99. Defendants were aware the process of getting on the app had insufficient safeguards to stop fraud.

100. Even when Defendants became aware of the pending lawsuits caused by their fraud, Defendants did not take reasonable effort to stop the fraud. Rather, Defendants' sales team simply tried to get as many restaurants to sign up on the app as possible so that these restaurants would inadvertently sign arbitration agreements. This was an effort to fraudulently deprive victims of their Constitutional rights and was not for the purpose of stopping any fraud.

101. The dangerous nature of the app's defects alleged above were a substantial contributing cause of the injuries suffered by Plaintiffs.

102. WHEREFORE, Plaintiffs pray for judgment against Defendants for an amount in excess of Fifteen Thousand Dollars ($15,000.00) in compensatory damages, plus interest, costs and attorneys' fees.

103. DEFENDANTS' actions included oppression, fraud and malice, both actual and implied, with a knowledge of the probable consequences of their behavior. As such, DEFENDANTS are subject to exemplary or punitive damages.

104. That as a direct and proximate result of the aforesaid breach on the part of DEFENDANTS, PLANTIFFS and the Class has been damaged, and are entitled to punitive damages, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

105. DEFENDANTS, and each of them, violated their duties with a conscious disregard for the rights of PLAINTIFFS and the Class, which rises to the level of oppression, fraud, and/or malice, and which subjected PLAINTIFF to cruel and unjust hardship. PLAINTIFF is therefore entitled to punitive damages against DEFENDANTS, and each of them, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

. . .

106.    That Plaintiffs have been required to retain the Law Offices of **BIGHORN LAW** to prosecute this action, and is entitled to recover their attorney's fees, case costs and prejudgment interest.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS expressly reserving the rights herein to include all items of damage, demand judgment against the DEFENDANTS, and each of them, as follows:

1. For general and special damages in excess of Fifteen Thousand Dollars ($15,000.00);

2. For compensatory damages in excess of Fifteen Thousand Dollars ($15,000.00);

3. Punitive and exemplary damages in an amount in excess of fifteen thousand dollars ($15,000.00);

4. For Plaintiffs' costs and disbursements of this suit;

5. For any and all pre and post judgment interest allowed under the law;

6. For reasonable attorney's fees incurred herein; and

7. For such other and further relief as the Court may find just and proper.

DATED this  20th  day of June, 2025.

**BIGHORN LAW**

By: /s/ Kimball Jones
KIMBALL JONES, ESQ.
Nevada Bar No. 12982
3675 W. Cheyenne Ave., Suite 100
North Las Vegas, Nevada 89032
*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that I am an employee of **BIGHORN LAW**, and that on this  20th   day of June, 2025, I served a copy of the foregoing ***SECOND AMENDED COMPLAINT*** as follows:

☒ Electronic Service – By serving a copy thereof through the Court's electronic service system (PACER) to all registered parties; and/or

☐ U.S. Mail – By depositing a true copy thereof in the U.S. mail, first class postage prepaid and addressed as listed below:

Kirk B. Lenhard, Esq.
Maximilien D. Fetaz, Esq.
Jamie P. Leavitt, Esq.
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

Kate Spelman
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, CA 90071-2246

Rémi Jaffré
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036-2711

*Attorneys for Defendants Uber Technologies, Inc., Rasier, LLC, and Berchmann Melancon*

　　　　　　　　　　　　　　　　　　*/s/ Amy Cvetovich*
　　　　　　　　　　　　　　　　　　An employee of **BIGHORN LAW**